Good morning, Your Honors, opposing counsel, Madam Clerk. I'm Blair Christensen and I represent Superintendent Zee Hyden in this appeal. This morning we'd just like to touch upon the main point of the case, which is that Mr. Douglas' trial counsel made a sound tactical decision. There's nothing that was missed by not playing the tape of either the 9-1-1 interview or the officer interview. Mike, do I understand correctly the facts here that the words that were on the 9-1-1 call came into evidence? The words in... A man calls 9-1-1 and talks to the dispatcher or policeman or whoever takes the call. I think it was a cop. There are words that are used by the caller and the recipient of the call, and there's also a tape which shows how the words sounded. Were the words... Did the words come into evidence? The transcript of the words did not come into evidence, to my knowledge. I don't believe that's true. I believe Mr. Hopper, Mr. Douglas' trial attorney, had the transcript in his hand and was prepared to enter him into evidence, but his testimony during the post-conviction relief proceedings was that he believed the cross-examination was going exactly as he intended, so he did not feel it was necessary to put the transcript or the audio tapes into evidence. Well, what was covered, did he say, what was covered by the cross-examination that made the introduction of the transcript unnecessary? Your Honor, if you look at the excerpt at page 25 through 24 through 25, would be Mr. Hopper's cross-examination of Mr. Ali, and he admits that, in fact, he never told Officer Troll that he had seen a weapon or that Douglas gestured as though he had a weapon, and that, in fact, if you look at the transcript page 90, it's kind of cut off, but it would be 92 through 93, he says that, in fact, the grand jury was the first day on which he told anybody that Douglas gestured as though he had a weapon. And the testimony, Mr. Hopper's questions on cross-exam are taken, if you look at transcript 80, when the district attorney asked you about the weapon that the robber had, you said – Where are you now? I'm sorry. I'm page – transcript page 88. Go ahead. When the district attorney asked you about the weapon that the robber had, you said that you hadn't told the Officer Troll because he hadn't asked you. That comes from the direct examination of Mr. Ali, which would be on page 14 of the excerpt. And there's a very clear direct examination of Mr. Ali that starts on page 46 of the So the words of the 9-11 transcript, you say, were not introduced, but the substance that he never saw the gun or he was never asked that and so forth came in under this clause. Yes, absolutely. There is no way – there is no way that the jury was not aware or, in the positive, the jury was absolutely aware that Mr. Douglas – that Mr. Ali had not – had not told Officer Troll or the 9-11 operator that Mr. Douglas gestured as though he had a weapon and he had told the 9-11 operator and Officer Troll that he had not seen a weapon. Was that – was that argued to the jury? It was. Mr. Hopper argued in cross-examination – let me just find that – find that in just a moment. But in cross-examination – let me see. Closing argument excerpt at page 84. In his cross-examination, he argues – or in his closing argument, he argues that the very first time that he says he gestured as though he had a weapon was during the grand jury proceedings. And either way, during the post-conviction relief proceedings, Mr. Hopper was adamant about the fact that he had sound trial tactic reasons. Could you help me on that a minute? The attorney said, if I understood it right, basically he had already made the cab driver look pretty bad in terms of contradictions and making up stuff. And he didn't want to break things up by playing the tape for the jury, because the cab driver might regain his composure and get better. And the jury would also hear on the tape how sloppy the policeman's questioning was, and that could explain away the apparent contradictions. Have I got that right? Yes, Your Honor. That was the lawyer's explanation? That is the lawyer's explanation. Could you tell me a little bit about – I always used to look at the clock during cross so that the breaks would come at tactically advantageous times for me. Absolutely. Can you tell me anything about the times of the direct and the cross and when the tape would have been played? Basically, I'm looking for whether the lawyer could have wrapped it up before the defendant had a chance to go to the bathroom and talk to his lawyer and that kind of thing. The defendant? Mr. Douglas could have had a chance? Tell me the times. The witness could have? Witness. Okay. I believe – I don't know if I'm understanding your question correctly, but my understanding was – I want to know the times. When the lawyer says, I didn't want to let the cab driver regain his composure, that immediately makes me think of what was showing on the clock and how the recesses were going. Well, I think that he thought just the act of playing the tape and that time of the actual moments of playing the five – I believe it's like a five-minute, 20-second tape, that five minutes would have given him a chance to compose himself. And even if you continued the testimony of the witness after that five minutes and 20 seconds, Mr. Ali would have composed himself during that five minutes, regardless of whether there was a break taken after that time. Five-minute, 20-second tape. Yes. Plus, I assume there would have been some delay time in terms of setting up the recorder, which he said he had with him. Absolutely. But I think five minutes and 20 seconds during a time in which somebody is nervous, squirming as he said he was, not making eye contact, all of those things, five minutes is more than sufficient time to regain your composure. The lawyer had a recorder with him to play the tape? He had it with him on the table and he had the transcript in his hand when he said that he strategically chose not to play that. And listening to the tape, I think it can go either way. Any one of you could decide it would have benefited him or not benefited him to play the 911 tape or to play the interview tape, but in hindsight, the only person who could really judge that at that moment was Mr. Hopper. And he was there. He saw Mr. Ali squirming in the seat. He saw, you know, whether he was making eye contact. He saw whether it was going to be to benefit his client to play that or not. And it's very hard to gauge from a transcript what someone's actual demeanor is. It seemed to be important to Judge Sedgwick that the objectively unreasonable test under AEDPA actually applied to the reasonableness of Mr. Hopper's decision not to play the tape. What's your response to the district court's legal rationale? Well, Your Honor, the appellant believes that the district court applied the incorrect standard to the district court's, to the court of appeals' decision because the court of appeals applied the proper standard of the Reischer test, which is exactly the same, mostly obviously more, as we argued in our brief, more beneficial to the defendant than the federal standard because the prejudice prong is easier to make. Maybe I didn't articulate my question very well. What I understood Judge Sedgwick to be saying was, notwithstanding Mr. Hopper's explanation for his tactical decision not to play the tape, it was an unreasonable decision, and therefore the Alaska court of appeals was objectively unreasonable when it concluded that this was a reasonable tactical decision by the defense not to do it. And I don't, I have the same question for Mr. Christensen. I don't understand how you can square that thinking with the case law that says once you find that there is a tactical decision, it has to be, it's a presumed. Yeah, I mean, I don't want to say that it's an irrebuttable presumption, but it's a pretty strong basis to conclude that there is no violation. Your Honor. I'm not sure that Judge Sedgwick got the law right in applying it to what Mr. Hopper testified was the basis for his decision. My concern has always been, I do, Your Honor, and my concern has always been the decision that that's more of a factual finding on the record than it is an application of the habeas law, and that he reread the record and made a different factual determination than the Alaska superior court judge did. Well, the superior court judge sort of spontaneously declared as I read the transcript, at the hearing, that's a classic tactical decision. But she did go on. I mean, I think it's important to note that on page 125 of the transcript, she does note that she applies the Alaska standard, that it's a reasonable tactical decision. And she's the one that's there. She's watching Mr. Hopper. She's making those factual findings about who's more credible. But I think that Judge Sedgwick went all the way back and redetermined those factual findings. And so I don't think he's applying the habeas standard. I think he's revisiting factual findings and remaking those factual findings. I do not believe he's applying the habeas standard. Oh, sorry. No, I think that answers it. Okay. Thank you, Counsel. Thank you, Your Honor. May it please the Court, good morning. My name is Kevin McCoy. I'm with the Federal Defender's Office in Anchorage, and I represent Mr. Douglas. Counsel, my slip of the tongue when I referred to the cab driver as the defendant was probably because he got twisted around and made to look like such a dishonest man by this very effective cross. I don't understand why you'd want to play the tape. Oh, I do. I'm on the ropes this way. I do. First of all, I don't know that he was on the ropes, but I would disagree with you. But first of all, let's remember that the element that distinguishes first-degree robbery from second-degree robbery in this case is whether the man made a weapons-like gesture. That's number one. There was only one eyewitness to this robbery. Yeah, and the cross is so good. Why would he want to play the tape? The cross was not that good because imagine a generally recognized unreliable person makes an accusation. Take it out of this case. We all know in our communities there are certain people that we might agree are generally unreliable. If that person makes an accusation and then goes to trial and the defense lawyer has a tape that shows that the person was not being honest or was not being truthful or made a substantive statement that negates the allegation, it is objectively unreasonable not to play that tape. Now, Mr. McCoy, you're falling into the same trap I think Judge Sedgwick did. Is that the object of the objectively unreasonable test under AEDPA? Or is it the factual determination by the Alaska Superior Court judge on the basis of the testimony from Ed Hopper and the affirmance by the Alaska Court of Appeals to which we then ask, was there determination that this was a tactical decision, objectively unreasonable? My response to your question is my best response, I think, is that the determination of whether something is tactical is a factual question. The Alaska Court of Appeals and the Alaska trial judge said that Mr. Hopper said that he made a tactical decision not to play the tape. The question for this court and the question for Judge Sedgwick was whether that was objectively reasonable. Wait a minute. I don't know if that's, Strickland uses the phrase, it says in Strickland and all the cases following, a tactical choice made by counsel during the heat of trial is, quote, virtually unchallengeable, close quote. Now, virtually unchallengeable does not mean unchallengeable. It could be stupid enough to be challengeable. But virtually unchallengeable means close to unchallengeable. I agree. I understand. And I think Judge Sedgwick understood. It seems to me that when you stack that up on top of the edpedeference that we're supposed to give the Alaska Court of Appeals and also looking at the record and seeing where a lawyer could think, wow, this cab driver's been about as effectively impeached as I could dream of, I don't get where there can be any mileage to a challenge. A prior inconsistent statement that no weapons were involved, a prior inconsistent statement that is there anything else that you can tell me that we can do? He got it out that the cab driver kept changing his story on whether he saw a weapon. No, he didn't. He was able to get the cab driver to admit that the first time he said anything about a weapons-like gesture was at the grand jury. What he didn't have was substantive evidence at the time from his on-the-scene statement, essentially direct evidence from the eyewitness that there was no weapon. That's the point. It's what you use. I mean, you can say three months later he said this is the first time I've mentioned the weapons-like gesture. That may go to reliability, but that is totally different than direct evidence from the one eyewitness. Mr. McCoy, I'm looking at page 89. This is the cross-examination of Mr. Ali, starting at line two. And Mr. Hopper asked Mr. Ali, so is it your testimony that he didn't, meaning the officer, he didn't ask you, did you see a weapon, and you said no? And his answer is yes, sir. So he continues this, that he didn't tell the officer that he saw any weapon. I told him no, I didn't see the weapon. What page? Page 89 of the transcript. It's lines two through six. So to get back to Judge Kleinfeld's question, it's in front of the jury that this guy never told the police that he saw a weapon. It's in front of the jury that he remembered for the first time two months later in the grand jury, the first time he ever said anything about a gesture. What more would the tape have added if the defense lawyer thinks he's got the witness on the ropes? What it would have added was if you read that cross, the taxi cab driver was consistently saying I wasn't asked the right question. He asked me if I saw the weapon, not whether the guy made a gesture or anything like that, and that's not true because he wasn't asked whether he saw the weapon. He was asked were you threatened. I mean, there were two things. You asked whether the 911 tape, the words were presented to the jury. They were not. There was evidence from the officer, but the officer who took his statement from Ali, who said he didn't ask me whether I saw a weapon. If he'd asked me a more precise question, I would have answered more precisely. That's a lousy answer. I mean, a guy says, well, the reason my stories have varied is I wasn't asked the right questions. That's a lousy answer. The jury might have accepted that with the impeachment. They might have accepted it, but usually once things are really good, what you do is you shut up and sit down because they're more likely to turn worse than better. Well, Mr. McCoy, with a record like this, and even assuming it's so that it would have been helpful to introduce the 911 transcript or even play it itself, it simply doesn't mean that the decision not to do so is ineffective. It is, and my answer is because the test, I mean, we know we have a tactical decision. That's the finding of fact that we have to defer to. The question is whether that's objectively reasonable under the circumstances, and my answer is that it is not. Whether the finding is objectively reasonable. That's correct. Not whether the decision was objectively reasonable. In other words, I think so. I mean, I think I understand your question. In other words, the tactical. The finding is supported by the record. Right. It's a factual finding. Was it tactical or was it just, you know, did he just do it? And he asserts. The record adequately supports the finding that it was tactical. I agree. Because the lawyer had the transcript and he had a tape recorder ready to go. Now, why is that objectively unreasonable? But that's the question. Why is it objectively unreasonable? Because the jury was deprived of substantive evidence that there was no weapon, no weapon-like gesture at the time, direct evidence from the eyewitness. But the eyewitness has said. I lost the antecedent of it. I thought what you were looking at to see if it was objectively unreasonable was defining a fact that it was tactical. But you used the word it without a clear antecedent. And I think you're switching back and forth between that and whether the lawyer's decision not to play the tape is objectively unreasonable. But there we don't look at it to see if the lawyer's decision to play the tape was objectively unreasonable. Instead, it's virtually unchallengeable. Which does not mean it cannot be challenged. And I think that you look at the record when you have one element that's in dispute here, whether there's a weapons-like gesture or not. And if you have evidence that the witness never reported that at the time, it's the value of the inconsistent statement. You keep arguing this point, but I think you're making the same error that I believe Judge Sedwick made, which is you're reviewing it as if you were on direct review looking at an IAC claim. But under AEDPA, I think what we're doing is asking, first of all, was there a factual determination? Yes. Was it unreasonable? No. Did the Alaska courts apply Strickland? Yes. Was their application of Strickland finding no violation objectively unreasonable? We don't go back and re-weigh the facts and come to a different conclusion. They could be wrong in their review of the factual record that it was tactical, and still we would have to apply objectively unreasonable deference under AEDPA. I think I agree with everything that you've said, except that you have to look at that record. So the lawyer can be wrong under Strickland, and the Alaska Court of Appeals can be wrong on the law, and it can be wrong on the facts, and we still are obligated on the federal side to deny habeas relief unless they're way out there in the clear blue sky. Well, I mean, way out there. I mean, it's – They have to be worse than wrong because Williams says unreasonable is worse than wrong. I mean, I guess what I'm saying is that you still look at that transcript. You decide whether the tactical claim, which is what it is, is objectively reasonable. And our argument is that it's not when you're talking about direct evidence that negates a central element of the charge and which casts the rest of the testimony in doubt. And that's our argument. And you say people of reason could not make even the wrong decision, that the lawyer made a defensible tactical judgment in the heat of trial. I think so. What I'm saying is – what I'm trying to say, and I don't mean to be facetious, is that it is objectively unreasonable for this lawyer to claim a tactical reason or that his claim – it's objectively unreasonable that his tactical claim is real. Because we're talking about a central element and because the jury was deprived of evidence from the only eyewitness's mouth, there were no weapons involved. That's my argument. Thank you, counsel. Thank you. We exhausted your time. If you want to take 30 seconds, do it, but no more than that. Your Honor, just to briefly summarize, the appellant would just like to stress that there was nothing to be gained by playing the tapes. Mr. Hopper had effectively gotten Ali – Mr. Ali to admit everything he was – and so playing the tapes he reasonably believed could have hurt his client. And so it was a reasonable strategic decision not to play the tapes. And as previously stated, the Alaska Superior Court and the Alaska Court of Appeals did not misapply any federal law. And we would request that this court reverse the district court's order and reinstate the conviction. Thank you. Thank you, counsel. Douglas v. Hyden is submitted.
judges: Kleinfeld, Tashima, Tallman